**IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

IN RE:  JONESBORO TRACTOR SALES, INC.,               CASE NO. 3:20-bk-11561J
                                                                                    (Chapter 11)

                        **Debtor-in-Possession.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Jonesboro Tractor Sales, Inc., the Debtor-in-Possession in this Chapter 11 proceeding,

(the **"Debtor"**) filed its *Motion for Determination that Contracts/Agreements Between Debtor*

*and Kubota Tractor Corporation are Assumable* (the "**Motion**") (Doc. No. 62) on May 5, 2020.

Kubota Tractor Corporation ("**Kubota**"), a secured creditor, filed its *Response in Opposition to*

*Motion for Determination that Contracts/Agreements Between Debtor and Kubota Tractor*

*Corporation are Assumable* ("**Response**") (Doc. No. 81) and a brief in support of same (Doc.

No. 82) on May 27, 2020.  In addition, Kubota filed its *Motion for Relief from Stay* (the

"**MFRS**") (Doc. No. 83) on May 27, 2020.

A consolidated telephonic hearing was held on the Motion and the MFRS on June 18,

2020.[1]  Joel G. Hargis and Oswald C. "Rusty" Sparks appeared on behalf of the Debtor.  Ms.

Wilma Grissom was also present and testified on behalf of the Debtor.  Kyle T. Unser appeared

on behalf of Kubota.  Bruce Shanahan and Brian W. Hockett were also present.

The parties' dispute arises primarily from two agreements that define the relationship

between the Debtor and Kubota—the Dealer Sales and Service Agreement (the "**Dealer**

---

[1] The Court was not conducting "in court" hearings on June 18, 2020, pursuant to the Administrative Order of the
Court dated March 16, 2020, regarding the COVID-19 pandemic. The Administrative Order can be found at:
https://www.areb.uscourts.gov/sites/arb/files/Bankruptcy%20Court%20Administrative%20Order%20March%2016
%202020.pdf.

Servicing Agreement") and the Dealer Terms and Discount Schedule (the "**Dealer Terms Agreement**").  The Court will refer to both agreements collectively as the "**Dealership Agreement**."

The issue before the Court is whether the Dealership Agreement is an assumable executory contract or whether it is non-assumable as "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the [D]ebtor" under Section 365(c)(2) of the Bankruptcy Code.  After hearing the testimony of Ms. Grissom, receiving exhibits into evidence, and hearing the parties' arguments, the Court took the matter under advisement.

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) and (O).  The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 4001 and 9014.

## II. Facts

Kubota, a secured creditor of the Debtor, filed a proof of claim in the amount of $6,574,466.35.  The claim is secured by the "Debtor's inventory of [wholegoods], parts and proceeds."  (Kubota Ex. D).  The relationship between the Debtor and Kubota, as stated above, is governed by the Dealership Agreement.  The Court will begin with a summary of provisions contained in the portion of the Dealership Agreement introduced into evidence and then discuss Ms. Grissom's testimony.

A. The Dealership Agreement

The Dealership Agreement consists of several documents including the Dealer Servicing Agreement, the Dealer Terms Agreement and various addenda, exhibits, policies, operating and procedural directions, bulletins, instructions, and other manuals issued by Kubota incorporated by reference.  The Dealer Servicing Agreement is twenty-four pages in length (not including exhibits, addenda, etc.) and appoints the Debtor an authorized dealer of Kubota products.  The Debtor has the non-exclusive right to purchase from Kubota certain products for resale subject to certain terms and conditions.

The payment terms under the Dealership Agreement were a primary focus of the parties at the hearing.  The Dealer Servicing Agreement provides as follows:

> a. **Payment Terms**.  The terms and conditions of sale of all orders for [p]roducts placed by [the Debtor] and accepted by [Kubota] shall be as set forth in the [Dealer Terms Agreement], as amended in the sole discretion of [Kubota] from time to time. Each sale of [p]roducts by [Kubota] to [the Debtor] may, at [Kubota's] sole discretion, be paid for by cash, on open account, C.O.D., by electronic funds transfer ("EFT"), pursuant to financing arrangements previously made by [the Debtor] and accepted by [Kubota], or pursuant to other terms and conditions as determined by [Kubota].

(Kubota Ex. A, ¶ 4.a).  To secure the Debtor's "performance, payment, and other obligations" to Kubota, the Debtor granted Kubota a security interest in the various products to be purchased by the Debtor from Kubota.  (Kubota Ex. A ¶ 4.b).  Additional terms of the Dealer Servicing Agreement address the filing of financing statements, location of collateral and records, inspection of collateral and records, and insurance requirements.

The Dealer Servicing Agreement also covers, *inter alia*, the Debtor's local market area, the mode of transportation of products, risk of loss, shipment charges, and diversions of shipments.  Price changes and taxes are also covered in the Dealer Servicing Agreement.  Kubota "may, without prior notice" change the price of any product at any time.  (Kubota Ex. A, ¶ 3.a).

The longest section of the Dealer Servicing Agreement is the "Dealer Performance" section covering quality and performance, sales goals, service, facilities, personnel, inventory, advertising, information technology, financial viability, financial information, business location, ownership information, management information, audit rights, and compliance rights. The Debtor is to use its "commercial best efforts" to "aggressively promote, advertise, and operate" its Kubota dealership. (Kubota Ex. A, ¶ 6.a.i).

In addition to this section covering quality and performance, an Exhibit C to the Dealer Servicing Agreement also provides dealer performance criteria for parts stocking, special servicing tools, training personnel, service capabilities, and additional performance requirements. The additional performance requirements in Exhibit C explain tier levels assigned to the different product lines and the required stocking and ordering requirements for each tier. According to the testimony, the Debtor has been assigned a Tier 2 level. The dealer requirements are numerous and very specific for how the Debtor is to carry out its operations.

The Dealer Servicing Agreement also covers signage and information concerning trademark and software licenses. The guidelines for dealing with warranties and warranty service is covered in length in the Dealer Servicing Agreement. The importance of using genuine Kubota parts for its products is explained.

The default section of the Dealer Servicing Agreement was also discussed at the hearing. The Events of Default section contains thirteen separate subparagraphs. Kubota's counsel mentioned performance defaults. That paragraph provides:

> [The Debtor's] failure to fully and completely satisfy the Dealer Certification Guidelines; any additional performance criteria set forth in Exhibit C; Dealer Sales Goals; Service Standards; Facilities, Personnel, and Inventory Standards; Advertising Standards; or IT Standards of this Agreement after the expiration of six (6) months following receipt of written notice from [Kubota], or such longer period to which [the Debtor] and [Kubota] may agree in writing.

4

(Kubota Ex. A, ¶ 16.a.iii).

Another event of default discussed at the hearing was the "commencement by [the Debtor] . . . of any voluntary case under any federal or state bankruptcy . . . Law." (Kubota Ex. A., ¶ 16.a.viii). The parties also discussed Kubota's rights upon default, which include the right to repossess its collateral and other remedies allowed by law.

The Dealer Servicing Agreement also contains termination provisions and provides, among other things, that Kubota may terminate the agreement upon any default of the Debtor. Kubota also introduced into evidence the Dealer Terms Agreement, a twenty-one page document containing the dealer terms and discount schedule and covering numerous topics including trade discounts, floor plan financing terms for equipment and parts, and other terms.

The Dealership Agreement was introduced into evidence under seal. The above summary of the information covered is vague in an attempt not to disclose details of specific requirements except where the provisions were discussed in open court. Although the Dealership Agreement incorporates by reference other documents, such as manuals, policies, operating and procedural directions, and bulletins, none were introduced into evidence.

B. Testimony of Ms. Wilma Grissom

Ms. Grissom, the ninety-nine percent owner of the Debtor, testified that she and her husband started Jonesboro Tractor Sales in 1969. In 1980, the Debtor began selling some Kubota products and, in 1992, became a Kubota dealership. Ms. Grissom has been active in the management of the Debtor over the years until her son began managing the business in 2009, just before her husband passed away. Ms. Grissom became actively involved in the business again in 2014 and took over the management of the business from her son in May 2019. After a creditor to whom the Debtor was required to make substantial weekly payments removed several

thousand dollars from a checking account, the Debtor filed its bankruptcy petition on March 21, 2020.

Ms. Grissom testified that she called Kubota and some of her other vendors to explain the possibility of the Debtor filing bankruptcy. It was important to her to contact Kubota because doing business with Kubota as usual was important to the continuing operations of the Debtor. In her conversations with Kubota representatives she testified that "there was no implication that there would be any change in the way of doing business." (Tr. at 49). It was her understanding from speaking with Kubota representatives Clay Young and Chris Resot that the Debtor was the first Kubota dealership to ever file bankruptcy, but these representatives did not foresee the bankruptcy being a problem in the Debtor's relationship with Kubota.

The sale of Kubota products accounts for over eighty percent of the Debtor's total sales per year. In 2019, the Debtor had $10.1 million in total sales with $8.3 million being from the sales of Kubota products. In 2018, the Debtor had $10.2 million in total sales with $8.3 million being from the sales of Kubota products. As of the hearing date, the Debtor has had $3.6 million in total sales with $3.1 million being from the sales of Kubota wholegoods.[2] According to Ms. Grissom, the Debtor is on track to have total sales at the same or higher levels than the past two years.

Kubota conducts annual performance assessments for its dealerships. The Debtor's Kubota operations have been very successful, earning it an "elite" status for years. The elite status gives the dealership certain privileges and incentives.

To Ms. Grissom's knowledge, the Debtor has never been in default under the Dealership Agreement with Kubota, other than by filing bankruptcy. She testified that she has never been

---

[2] Wholegoods were described as tractors, lawnmowers, excavators, and other large items as opposed to parts. Wholegoods and parts together are referred to as "products" in the Dealership Agreement.

notified of any default by Kubota.  The parties agreed that the Debtor was not in a monetary default at the time of the bankruptcy filing.

The Debtor's business is located in Jonesboro, Craighead County, Arkansas, and the Debtor is authorized to advertise Kubota products in the eight counties surrounding Craighead County.  Customers come from different parts of the state and from outside the state; approximately forty percent of the Debtor's business is from repeat customers.

Ms. Grissom acknowledged that prior to filing bankruptcy the Debtor purchased products from Kubota using only the open account financing option.  Since the petition was filed, however, Kubota has not extended credit to the Debtor and any new product ordered must be paid by cash or C.O.D.  This is a result of Kubota's decision not to allow purchases on an open account after the bankruptcy filing, not because of a modification to the Dealership Agreement. Since March 21, 2020, the Debtor has been operating with Kubota on a cash basis.

The Debtor's postpetition sales have included sales of inventory on hand on the petition date, as well as retail sales.  A retail sale occurs when a customer wants to buy a particular Kubota product that is not on the Debtor's lot, the Debtor orders the product from Kubota, and the Debtor pays for the product "as soon as it hits the lot."  (Tr. at 53).  Since filing bankruptcy, the Debtor has made several retail sales, including two retail sales for the largest excavator in Kubota's product line with purchase prices of over $100,000.00 each.  The Debtor ordered both excavators from Kubota on a cash basis.

As to the postpetition sales from inventory on hand, Ms. Grissom admitted the wholegoods inventory sold postpetition has not been replaced, resulting in the wholegoods inventory level decreasing.  Ms. Grissom testified that it was her understanding that after the bankruptcy filing Kubota would not allow the Debtor to order wholegoods unless it was a retail

sale transaction.  She did not believe Kubota would allow the Debtor to order wholegoods for its

inventory.  Kubota introduced into evidence an email from Clay Young to Ms. Grissom and an

employee of the Debtor, which read:

> Wilma: attached is a list of your open orders, based on the current COD situation
> which of these can we leave as open orders to be paid for when they arrive?  This
> list does not include anything ordered retail.  I can delete these orders from your
> open order status to prevent any past due situations if you would like.  Again this
> does not include anything on retail order or in no way inhibits your ability to
> transfer units in for retails.

(Kubota Ex. I).  Ms. Grissom did not recall ever receiving this email but during the hearing

found the email in her email inbox.  In reading through the email on redirect, Ms. Grissom stated

she did not understand the statements.  Ms. Grissom was adamant, however, that she had not

seen this email before the hearing and that it was her understanding that Kubota would sell

wholegoods to the Debtor postpetition only for retail sale transactions, not for inventory.

There was an attachment to the email with "open orders," some placed by the Debtor

prepetition at a dealer meeting in 2019.  Ms. Grissom testified the prepetition orders were

purchased under the open account financing arrangement, although the email made clear that

financing was no longer an option postpetition.

In addition to selling wholegoods, the Debtor also sells parts for the various

wholegoods.  The Debtor has replaced the parts inventory sold postpetition with cash purchases

from Kubota.

When asked on cross examination about whether the Debtor was required to maintain a

certain level of inventory, Ms. Grissom admitted that Kubota does have minimum inventory

levels based on the tier of the dealership.  She added that prior to the bankruptcy filing the

Debtor's inventory levels exceeded the amounts required by the Dealership Agreement.  When

asked if the Debtor has replenished any of the inventory sold postpetition, Ms. Grissom again

testified no because it was her understanding that Kubota was not allowing the Debtor to purchase wholegoods for inventory.

During the hearing, Kubota's counsel referred Ms. Grissom to the Tier 2 minimum stocking and order requirements in the Dealer Servicing Agreement.  When asked whether her level of inventory met the requirements, Ms. Grissom responded, "I would say very close to that, yes."  (Tr. at 57).  She added, "There is a problem with Kubota's shipping and manufacturing. [Kubota is] behind on the manufacture of some things."  (Tr. at 57.)  Later she stated that the Debtor has "a combination of all the units that Kubota offers."  (Tr. at 65).  No evidence was introduced to refute her testimony.

Ms. Grissom further explained that the provision for inventory levels is a new management inventory control put in place by Kubota.  She understood that the levels were just suggestions from Kubota but not strictly enforced.  Ms. Grissom testified that at a "dealer meeting" it was explained that the "dealers were going to try to maintain those levels."  (Tr. at 81).  She further explained that "the problem with [maintaining the levels] has been Kubota's inability to supply some things . . . . If they . . . can't get it to us, then we . . . don't have it on the lot."  (Tr. at 81).  At no time during the Debtor's relationship with Kubota has Kubota notified the Debtor of any problem with the Debtor's inventory levels.

Ms. Grissom testified that the financing option in the Dealership Agreement was very helpful to the Debtor and she did not believe the Debtor would be able to maintain its inventory levels without financing.  Upon further questioning she testified that she believed the Debtor may be able to replenish turf and lawn equipment without Kubota's financing, adding that the Debtor does have money on hand that could be used for some purchases.  Ms. Grissom stated that because the Debtor wants to continue its relationship with Kubota, it had not sought third

9

party financing options for the Kubota line at the time of the hearing. The Debtor testified that if the Dealership Agreement is determined to be assumable, the Debtor would explore those possibilities.

The Debtor does have lines of credit established for other products. For example, the Debtor has a $600,000.00 line of credit with First Community Bank for purchasing equipment. As of the petition date, approximately $200,000.00 of the $600,000.00 line was extended. The Debtor also has a $220,000.00 line of credit with Centennial Bank for floor plan financing of its Bad Boy lawn equipment, with a current amount extended of approximately $145,000.00. In addition, TCF finances the Debtor's purchase of Cub Cadet products and Red Iron finances the Exmark line of products. Although the Debtor has other lines of products, if the Debtor is unable to assume the Kubota Dealership Agreement, Ms. Grissom believes the Debtor will be forced to close.

### III. Arguments

The focus of the parties' dispute is whether the Dealership Agreement is an assumable executory contract or whether it is "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the [D]ebtor" that is not assumable under the Bankruptcy Code. 11 U.S.C. § 365(c)(2) (2018).

The Debtor argues that the analysis begins with the Dealership Agreement itself, an agreement drafted by Kubota. The Debtor argues the primary focus of the Dealership Agreement is for Kubota to sell its products through the Debtor, not the extension of credit. It argues the Dealership Agreement provides three different ways for the Debtor to purchase Kubota products and only one involves the extension of credit. The Debtor further argues that Kubota is not being forced to make a loan, extend credit, or provide financial accommodations to

the Debtor, and although the Debtor took advantage of the open account financing option prepetition, since the bankruptcy filing it has only been allowed to use the cash and C.O.D. options.   It argues Kubota's postpetition removal of the financing option proves that the financing option is incidental to the Dealership Agreement.  Because the extension of credit is only incidental to the parties' relationship, the Debtor argues the Dealership Agreement cannot be classified as a financial accommodation.

As to the request for relief from stay, the Debtor argues that it is not in default under the Dealership Agreement, except for the act of filing bankruptcy, and the *ipso facto* clause is not enforceable.  The Debtor also argues that Kubota sales represent over eighty percent of the Debtor's business and the Dealership Agreement is essential to the Debtor's business.

Kubota acknowledges that it can insist on methods of payment other than the open account financing option, but it argues the Dealership Agreement nevertheless constitutes a financial accommodation because financing has always been a central part of the parties' relationship.  Kubota argues that prior to the bankruptcy filing, the Debtor always used the financing option to acquire Kubota products and points to Ms. Grissom's testimony that the financing arrangement is important to the Debtor's business.  Kubota further argues that without the open account financing option the Debtor cannot maintain the inventory levels required by the Dealership Agreement.

As to its request for relief from stay, Kubota primarily argues that if the Dealership Agreement is found to be a financial accommodation, the *ipso facto* termination provision is enforceable under Section 365(e)(2)(B).  It argues alternatively, even if the Dealership Agreement is found to be assumable, the evidence proves the Debtor cannot maintain required inventory levels and, without other credit arrangements to purchase inventory, cause exists for

relief from stay to be granted. It further argues if the Debtor cannot maintain the inventory levels required by the contract, then the contract has no value to the estate.

## IV. Discussion

The Court will begin by discussing the Debtor's motion to determine whether the Dealership Agreement is assumable and then address the MFRS.

A. <u>Is the Dealership Agreement an assumable executory contract or is it a non-assumable contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the Debtor?</u>

Section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."[3] 11 U.S.C. § 365(a) (2018). This general rule is subject to certain exceptions, including the following:

> (c) the trustee may not assume or assign any executory contract or unexpired lease of the debtor, . . . if—
>
> . . . .
>
> (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor[.]

11 U.S.C. § 365(c)(2) (2018).

The parties dispute whether the Dealership Agreement is a financial accommodation within the meaning of Section 365(c)(2). The phrase "financial accommodation" is not defined by the Bankruptcy Code. Courts interpreting Section 365 have looked to the legislative history and to a leading treatise for guidance. The legislative history of Section 365 provides:

> Characterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time.

---

[3] A debtor-in-possession has the rights and powers of a trustee with certain exceptions not applicable here. 11 U.S.C. § 1107(a) (2018).

124 CONG. REC. 32,396 (1978); 124 CONG. REC. 33,996 (1978). *Collier on Bankruptcy* further

expounds on the limited application of Section 365(c)(2), explaining:

> The scope of paragraph (2) is limited, however, and applies only to extensions of
> credit that are "loans," "debt financing" or "financial accommodations," and not to
> all contracts to extend credit. These terms are strictly construed and do not extend
> to an ordinary contract to provide goods or services that has incidental financial
> accommodations or extensions of credit.

3 COLLIER ON BANKRUPTCY ¶ 365.07[2] (Richard Levin & Henry J. Sommer eds., 16th ed.)

(footnotes omitted). Many courts interpreting Section 365(c)(2) have adopted a narrow reading

of the statute and have defined "financial accommodation" as "the extension of money or credit

to accommodate another." *E.g.*, *Citizens & S. Bank v. Thomas B. Hamilton Co. (In re Thomas B.

Hamilton Co.)*, 969 F.2d 1013, 1019 (11th Cir. 1992) (quoting *Transamerica Commercial Fin.

Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.)*, 945 F.2d 1089, 1092 (9th Cir. 1991) and

*In re Placid Oil Co.*, 72 B.R. 135, 139 (Bankr. N.D. Tex. 1987)); *Gov't Nat'l Mortg. Corp. v.

Adana Mortg. Bankers, Inc. (In re Adana Mortg. Bankers, Inc.)*, 12 B.R. 977, 986 (Bankr. N.D.

Ga. 1980).

Following the commentary in *Collier on Bankruptcy*, courts have also distinguished

"between contracts for which the extension of credit is the primary purpose, that is, a primary

contractual obligation, and contracts in which the extension of credit is only incidental to or a

part of a larger arrangement involving the debtor." *In re Thomas B. Hamilton Co.*, 969 F.2d at

1019. If the extension of credit is central, or integral, courts have found the contract is one to

extend a financial accommodation. *See, e.g.*, *In re Twin City Power Equip., Inc.*, 308 B.R. 898,

902 (Bankr. C.D. Ill. 2004) (finding financing integral to dealership agreement); *John Deere Co.

v. Cole Bros., Inc. (In re Cole Bros., Inc.)*, 154 B.R. 689, 692 (W.D. Mich. 1992) (finding the

extension of credit "an integral component" and "central purpose" of dealership arrangement).

If, however, the extension of credit is merely incidental to the parties' contractual relationship, courts have found the contract is not a financial accommodation within the meaning of the statute. *See, e.g.*, *In re Thomas B. Hamilton Co.*, 969 F.2d at 1020 (finding extension of credit in the form of debtor's obligation to repay creditor in certain situations incidental to overall credit card merchant agreement between parties); *Phillips v. McLane Co. (In re Fas Mart Convenience Stores, Inc.)*, 296 B.R. 414, 420 (Bankr. E.D. Va. 2002) (finding inventory financing provision was only part of a larger agreement, the primary purpose of which was to govern the sale of goods between parties); *In re Cole Bros., Inc.*, 137 B.R. 647, 652 (Bankr. W.D. Mich. 1992) (finding financing was only a part of the parties' contractual business relationship and therefore incidental), *rev'd sub nom. John Deere Co. v. Cole Bros., Inc. (In re Cole Bros. Inc.)*, 154 B.R. 689 (W.D. Mich. 1992).

In evaluating whether a contract fits within the exception of Section 365(c)(2), courts have also looked to the purpose of Section 365(c)(2), which "is to prevent the trustee from requiring new advances of money or other property." *In re Twin City Power Equip., Inc.*, 308 B.R. at 901 (citing *In re Whiteprize, LLC*, 275 B.R. 868, 873 (Bankr. D. Ariz. 2002) and *In re Neuhoff Farms, Inc.*, 258 B.R. 343 (Bankr. E.D.N.C. 2000)).  "The rationale of this subsection is that when 'the debtor files a bankruptcy petition, another party's contractual commitment to extend new credit to the debtor in the future may be unfairly onerous to that party.'" *In re Cole Bros., Inc.*, 154 B.R. at 691 (quoting Benjamin Weintraub & Alan N. Resnick, Bankruptcy Law Manual ¶ 7.10[3] (3d ed. 1992)).

In many of the cases where a financial accommodation was found, the creditor was *required* under the contract to provide credit or financing. *E.g., In re Sun Runner Marine, Inc.*, 945 F.2d at 1092 (creditor contracted to extend financing to dealers for benefit of debtor); *In re*

*Twin City Power Equip., Inc.*, 308 B.R. at 899-900 (creditor "accepted orders from the Debtor on credit" and agreement required creditor to ship goods unless the debtor's financial condition did not "justify the extension of additional credit"); *In re Cole Bros., Inc.*, 154 B.R. at 692 ("The requirement that the appellants extend credit is a central purpose of the group of contracts.").

This Court agrees with those cases that have adopted a narrow reading of Section 365(c)(2) and adopts the definition of "financial accommodation" as "the extension of money or credit to accommodate another." *E.g.*, *In re Thomas B. Hamilton Co.*, 969 F.2d at 1019. Here, the Dealership Agreement is a broad agreement between the parties. It establishes the Debtor as a Kubota dealer and governs every aspect of the parties' relationship, from the types of products the Debtor may purchase for resale, to the Debtor's business location and authorized market area, to the Debtor's advertisement and promotion of Kubota products. The Dealership Agreement also includes financing on an open account as one of three methods by which the Debtor, at Kubota's sole discretion, could pay for products from Kubota.

The Debtor argues because financing is only one aspect of a much larger business agreement between the parties, it is incidental, and therefore the Dealership Agreement is not a "financial accommodation" within the meaning of the statute. The Debtor urges the Court to follow the bankruptcy court's decision in *In re Cole Brothers, Inc.*, 137 B.R. 647 (Bankr. W.D. Mich. 1992) (hereinafter referred to as "*Cole I*"), *rev'd sub nom. John Deere Co. v. Cole Bros., Inc. (In re Cole Bros. Inc.)*, 154 B.R. 689 (W.D. Mich. 1992). In *Cole I*, the bankruptcy court reviewed various agreements between the debtor and John Deere and found that while financing was an important part of the agreements, the primary purpose of the agreements was to establish the debtor as a dealer of John Deere products. *Cole I*, 137 B.R. at 651. The court found the

15

financing terms were incidental to the agreement and therefore outside the exception of Section

365(c)(2).  *Id*. at 652.

Kubota argues this Court should follow the decision of *John Deere Company v. Cole*

*Brothers, Inc. (In re Cole Brothers, Inc.)*, 154 B.R. 689 (W.D. Mich. 1992) (hereinafter referred

to as "*Cole II*"), which reversed the bankruptcy court's decision in *Cole I*.  In *Cole II*, the district

court disagreed with the bankruptcy court that the financing terms were merely incidental, ruling

instead that "the extension of credit by [John Deere] is an integral component of the dealership

arrangement.  Credit is vital to the debtor's continued operation as a seller of farming and

industrial equipment [and] . . . is a central purpose of the group of contracts."  *Cole II*, 154 B.R.

at 692.  Kubota argues financing is at the heart of the parties' relationship, that prepetition the

Debtor always purchased inventory on credit, and that by Ms. Grissom's own testimony,

financing is critical to the Debtor's continued business.

The Court finds both parties' arguments valid and supported by the respective cases.

Were the financing terms of the Dealership Agreement more similar to the financing terms

involved in *Cole I* and *Cole II*, the Court's decision would be much more difficult.  Significantly,

however, the Dealership Agreement varies in one important aspect from the agreements at issue

in the Cole cases: Kubota is not *required* under the Dealership Agreement to extend credit to the

Debtor.  The Dealership Agreement provides:

> Each sale of Products by [Kubota] to [the Debtor] may, *at [Kubota's] sole
> discretion*, by paid for by cash, on open account, C.O.D., by electronic funds
> transfer ("EFT"), pursuant to financing arrangements previously made by [the
> Debtor] and accepted by [Kubota], or pursuant to other terms and conditions as
> determined by [Kubota].

(Kubota Ex. A, ¶ 4.a) (emphasis added).  Under the terms of its own contract, Kubota, in its sole

discretion, can require payment of products in cash or C.O.D.  It is not required to extend

16

financing to the Debtor, and in fact, the testimony at the hearing revealed that since the Debtor's bankruptcy filing, Kubota has not extended credit to the Debtor, but has instead required the Debtor to pay for new products in cash or C.O.D.  The Debtor has complied with Kubota's requirements and since the petition date has paid for all new products in cash or C.O.D., including the retail sales of two of Kubota's largest excavators with purchase prices of over $100,000.00 each.

The fact that Kubota is not obligated to extend financing under the terms of the Dealership Agreement distinguishes this case from *Cole I* and *Cole II*, as well as from two other cases cited by the parties: *In re Sun Runner Marine, Inc.*, 945 F.2d 1089 (9th Cir. 1991) and *Twin City Power Equipment, Inc.*, 308 B.R. 898 (Bankr. C.D. Ill. 2004).

Moreover, because Kubota is not required to extend financing to the Debtor, the Dealership Agreement is in line with the purpose of Section 365(c)(2), which is to prevent a trustee from requiring new advances of money from a creditor.  Kubota does not need the protections of Section 365(c)(2) because it is not *required* to advance new money to the Debtor. Its own postpetition conduct proves this point.

For the reasons stated, the Court finds the Dealership Agreement is not a contract to extend financial accommodations within the meaning of Section 365(c)(2).  Although not argued by the parties, the Court also finds, based on the evidence introduced at the hearing, that the Dealership Agreement is not a contract to make a loan or extend other debt financing.  The Dealership Agreement therefore falls outside the exception of Section 365(c)(2) and is an assumable contract.

17

B.  Is Kubota entitled to relief from stay to terminate the Dealership Agreement?

Having found the Dealership Agreement assumable, the Court must next address whether

Kubota should be granted relief from stay to terminate the agreement, repossess its collateral,

and de-brand the Debtor as a Kubota dealer.  Section 362(d) provides:

> **(d)** On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> **(1)** for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> **(2)** with respect to a stay of an act against property under subsection (a) of this section, if—
>
> > **(A)** the debtor does not have an equity in such property; and
> > **(B)** such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(1)–(2) (2018).  Kubota bears the "burden of proof on the issue of the debtor's

equity in property" and the Debtor "has the burden of proof on all other issues."  11 U.S.C.

§ 362(g) (2018).

Kubota's primary argument in support of its motion for relief from stay is that if the

Dealership Agreement is determined to be non-assumable under Section 365(c)(2), then relief

from stay would be appropriate because the agreement would have no value to the estate and

Kubota would be entitled, under Section 365(e)(2)(B), to enforce the *ipso facto* termination

provision in the agreement.  Generally, *ipso facto* termination clauses in contracts are

unenforceable in bankruptcy pursuant to Section 365(e)(1).[4]  Under Section 365(e)(2)(B),

however, the protections of Section 365(e)(1) do not apply to executory contracts "to make a

loan, or extend other debt financing or financial accommodations, to or for the benefit of the

---

[4] Section 365(e)(1)(A) prohibits the termination of an executory contract or unexpired lease "because of a provision in such contract or lease that is conditioned on—(A) the insolvency or financial condition of the debtor at any time before the closing of the case."  11 U.S.C. § 365(e)(1)(A).

debtor." 11 U.S.C. § 365(e)(2)(B) (2018). Because the Court has found the Dealership Agreement is not an agreement to make a loan or extend debt financing or financial accommodations, the exception in Section 365(e)(2)(B) does not apply, and the Dealership Agreement cannot be terminated solely because of the Debtor's bankruptcy filing. The Court must turn to Kubota's secondary argument.

Kubota alternatively argues that even if the Court finds the Dealership Agreement assumable, cause nevertheless exists to lift the stay because without financing from Kubota the Debtor cannot maintain the inventory levels required under the Dealership Agreement. Kubota also argues the Dealership Agreement does not have significant value to the estate if the Debtor cannot acquire sufficient inventory under the agreement.

The Debtor responds that any default based on inventory levels is an assumption of what may happen in the future, and that the Debtor has not been notified of any such default. The Debtor also points out that since its bankruptcy filing it has been successful in selling not only products in inventory, but also products that are not located on its lot through retail sale orders. Finally, the Debtor argues it is not in default of the Dealership Agreement, other than the act of filing bankruptcy itself, and therefore it deserves an opportunity to perform under the agreement, possibly by obtaining financing from a third party to purchase Kubota products.

The Court agrees that the only event of default proven at the hearing was the Debtor's bankruptcy filing itself, which is an insufficient ground upon which to terminate the agreement pursuant to Section 365(e)(1). The parties spent a considerable amount of time at the hearing discussing the inventory levels the Debtor is required to maintain under the terms of the Dealership Agreement. The evidence revealed that prepetition, the Debtor maintained inventory levels in an amount much greater than the minimum levels required by the contract. Since filing

bankruptcy, the Debtor has sold products in inventory without replacing the inventory, but Ms. Grissom's testimony revealed that current inventory levels nevertheless are approximately the same as the minimum requirements of the Dealership Agreement.   Furthermore, Ms. Grissom testified that she has never been notified of a problem with the Debtor's inventory levels.  Under the terms of the Dealership Agreement, six months' written notice is required to be given of failure to perform in order constitute an event of default.  No evidence was introduced to refute Ms. Grissom's testimony.

Ms. Grissom also testified it was her understanding that Kubota would not allow the Debtor to purchase wholegoods for inventory postpetition, which is why the inventory sold had not been replaced.  At the hearing, an email was introduced, which Ms. Grissom had not seen, suggesting that the Debtor could purchase wholegoods for its inventory from Kubota postpetition, but the purchases would need to be paid for in cash upon delivery of the items.  Ms. Grissom discussed the possibility of finding a third party lender to finance the purchase of products from Kubota.  She admitted she had not sought such financing at the time of the hearing, but she testified that the Debtor has third party financers for several of its other lines of products.  While Ms. Grissom admitted those existing financing arrangements cannot be used for the purchase of Kubota products, banks and other lenders have been willing to finance the Debtor's purchase of inventory of other brands of products, and may be willing to do the same for the purchase of Kubota products to maintain the required inventory levels.  Ms. Grissom testified that the Debtor has replaced parts inventory postpetition with cash purchases from Kubota.

The Court found Ms. Grissom to be extremely knowledgeable about the Debtor's business and found her testimony credible.  Based on the evidence received at the hearing, the

Court finds that, other than filing its bankruptcy petition, the Debtor is not in default of the Dealership Agreement.  Any inability of the Debtor to comply with the inventory requirements under the Dealership Agreement in the future is speculative.  The Debtor continues to sell Kubota products, has maintained its parts inventory postpetition, is not currently in default for failing to maintain required wholegoods inventory, and may be able to obtain third party financing for the purchase of Kubota wholegoods for inventory in the future.  The Court does not find at this time that the stay should be lifted for "cause" under Section 362(d)(1).

Nor does the Court find that the stay should be lifted under Section 362(d)(2).  The Court has determined the Dealership Agreement to be assumable.  The Debtor has an interest in this agreement.  Moreover, the agreement is necessary for the Debtor's effective reorganization.  The Debtor is a branded Kubota dealer.  While the Debtor carries other lines of products, Kubota sales represent over eighty percent of the Debtor's total annual sales.  The Debtor sold over $8 million in Kubota products in both 2018 and 2019, and Ms. Grissom testified that despite the bankruptcy filing, the Debtor is on track to have the same or higher levels of Kubota sales in 2020.

The Debtor filed its bankruptcy petition on March 21, 2020.  The Court believes the Debtor should be given an opportunity to reorganize, and relief from stay at this early stage is neither warranted, nor supported by the evidence introduced at the hearing.  The motion for relief from stay is denied.

### V. Conclusion

For the reasons stated herein, the Motion is GRANTED.  The Dealership Agreement between the Debtor and Kubota is determined to be an assumable executory contract.  Because Kubota is not required under the agreement to extend financing to the Debtor, the Dealership

21

Agreement is not a contract to make a loan, or extend debt financing or financial accommodations for the benefit of the Debtor within the meaning of Section 365(c)(2) of the Bankruptcy Code.

In addition, the MFRS is DENIED.  Relief from stay is not warranted at this stage of the proceedings.  The Debtor is not in default of the Dealership Agreement, other than the act of filing bankruptcy, and because the agreement is not one to make a loan or extend debt financing or financial accommodations, the *ipso facto* termination clause is unenforceable.  In addition, the Debtor continues to sell Kubota products, has maintained its parts inventory on a cash basis postpetition, and may be able to obtain third party financing for its wholegoods inventory postpetition if Kubota remains unwilling to finance the Debtor's purchase of Kubota products for resale.  The Debtor has an interest in the Dealership Agreement and the Dealership Agreement is necessary for the Debtor's effective reorganization.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  07/22/2020

cc:   Mr. Joel G. Hargis
      Mr. Oswald C. "Rusty" Sparks
      Mr. Kyle T. Unser
      Debtor
      U.S. Trustee